Case No. 25-1150, Modern West Longmont, LLC, Petitioner v. Federal Aviation Administration. Mr. Goldberg for the Petitioner and Ms. Lopez for the Respondent. Good morning, Your Honors. May it please the Court, Roy Goldberg on behalf of the Petitioner, Modern West Longmont, LLC. I would like to reserve two minutes for rebuttal. This case presents two different looks at our Federal Aviation Administration. On the one hand, we have the portion of the FAA that handles airport obstruction and analysis, and they dedicated the usual large number of key staffers, and they determined that this mixed-use development proposed by Modern West in Longmont, Colorado, did not present a hazard to air safety. On the other hand, we have an FAA airport district office manager local in Denver who paid no attention to what the large assemblage of the FAA side, the safety side, had decided and concluded on his own that it would violate Federal grant assurances if Longmont allowed the mixed-use development to happen. When that official, John Bauer, was repeatedly asked to provide an explanation for why this proposed development would not be compatible with airport operations, he just refused to do so, as did the Office of Chief Counsel and its airport law division. This is a classic case of arbitrary and capricious conduct. No reasonable explanation was provided for the action taken. The case calls to mind the court's ruling in Butte County v. Hogan. That decision relied on the Melville story, Bartleby the Scribner, who was asked, could you do some work for us? And he said, I'd prefer not to. That was his explanation, and this court also found in Butte County that was insufficient for the Interior Department in that case. Why aren't you standing here? Standing, Your Honor, is because as of the refusal to withdraw these letters, the final order was April 30th, 2025. What are you perceiving to be a final order as a legal matter, not your characterization? Sure. The reason why the April 30th email is it said, finally and determinative, we don't accept what you're asking for. We don't accept that the letters need to be withdrawn. Don't talk to us anymore. This is our final decision. We'd asked them three or four times to the Office of Chief Counsel. These letters are unlawful. Explain to us why they're lawful, but because you can't, they need to be withdrawn, and in that letter, they refused to do so. So that's a final order. It had legal consequences because my clients who had received both approval from Longmont for Modern West I, and then were very close to getting approval for Modern West II, and then all of a sudden these letters come out. That's why we call them poison pill letters, and everybody pulls back, and the Longmont refuses at that point to give any type of relief or to allow the zoning to go forward. So if you got something back from them that said, oh, we got your most recent note, yeah, we're with you. Good luck. That changes the circumstance you're in? If they'd withdrawn the letters, it would have totally changed circumstances, your honor. How do we know that? Because how do you know what the city would have done? I'm sorry for interrupting. No, no, no, it's a It's important. We think that this argument is just a procedural argument that the FAA is making because they can't win on the merits. Right. The reason why it is is because there's no real speculation. This is, with all respect, your honor, your case of the wrestling case. In the wrestling case that you're talking about, the Department of Education never went to Bucknell University and said, if you let these guys wrestle, we're pulling all your funding. But that's what's happened here. These letters said, if you allow this to happen, you will lose funding from the grant assurances. And it's very important for this airport. And the idea that somehow... Wait, wait, wait. Sure. Let's go back a little bit. You have three approvals you have to have to be able to be in the position you want to be in, city, state, and FAA. Right. Your argument essentially is, if we have the FAA, we have all the relief that we need. That's not true. The city has reasons that have nothing to do with the FAA. At least they state reasons that have nothing to do with the FAA. That's one of the things. But they state other reasons why they're taking the position. So how do you, either on standing terms or otherwise, it's a weird characterization. How do you get around that? To win, as you want to hear, doesn't get you what you want. Up until these letters, Your Honor, the city was approving this every step of the way. The letters... Bear with me. The city and state have not given approval. The city was... Nothing to indicate the state's going to waver, depending upon what the FAA, in response to your email, does. As reflected in our papers, the state is not a real player here, Your Honor. We're talking about how much money goes for the federal government, which is millions of dollars. The state is an add-on. At one point in, Your Honor, let me ask you to take a look at, in here, a particular letter from the city of Longmont. It is JA-207, right around the key time frame. It's September 25th, 2024. They say, in this instance, the FAA's determination of adverse impacts on airport operations constitutes a significant factor warranting further review. In other words, they're pulling the process because of the FAA. In the real world, nobody is doing anything because of the CDOT, Your Honor. That was an add-on. It has no real world significance. When you're a city official and the FAA comes and tells you, if you allow this development, you will lose funding, that's full stop. That's coercion, that's determinative, and there's nothing else out there that matters. That's the key play here. And, Your Honor, interestingly enough, the word on coercion, because that's part of the case law here, if you actually go back to, and it's in the record, it is 341, JA-341, back in May of 2024, 2023, rather, one of the counselors for the city of Longmont actually says there, and this is JA-341, on the record, it just feels like coercion. She's talking about the FAA, the first FAA letter from June 2023. So, we believe this, the record here clearly shows that there is coercion. So, I mean, is part of your argument that if you win on your claim against the FAA in this case, the city must fall, or they're guaranteed will fall? I'm not reading the record that way. We want the letters withdrawn, Your Honor. That's the relief we're seeking. Well, how do you, and I don't understand the standing there. If that's really all you're asking for, you want the letters withdrawn. Isn't that the city's fight? No, no, the city is neutral. I understand your interest, but I don't know how you can be here if that's it. We just want those letters withdrawn. Before the letters were withdrawn, we were doing the development. We were getting the approvals we needed. We withdraw the letters, the city no longer. And if you get it withdrawn, there's no guarantee the city's going to change its mind. Well, we know where the city was before the letters came in, which is they were approving it. I think this gets to the key difficulty, right? If you represented the city, this would be very straightforward. But we need to speculate about what the city would do. And what would be very helpful would be if there was evidence that the city still supports your projects. So, in the DNF Afonso case, they got some of the city officials to put in affidavits, and we said, great. And one difficulty for your position here is you don't have evidence of that type. So, how can we infer that the city still supports your projects? Well, we do have evidence, your honor. Thank you for the question. It's a 341 where Hildago, one of the counselors said, I feel coercion because of the FAA. We know that the FAA approved this process. So, one way to support your standing would have been to go to that council member and ask them, it was a predicate question of why the city isn't a party to the suit if it supports you, but you go and you ask them for an affidavit. And then we'd ask, well, that's just one city council member. How do we know what's going to happen? And it is a tough position, but our cases say it is a tough position when you rely on the actions of a third party. But there's no speculation here. They were approving. We have the approval for Modern West 1. We were very close to Modern West 2. That's very different than, for example, the National Wrestlers case. As far as the city goes, their regulator is the FAA. The FAA controls the money. And it is not realistic, your honor, with all due respect, to think that they are going to take the dog in the fight of the developer, the developer that is not even part of the FAA regulation. I totally agree with that. They certainly could say, we're not picking a fight with the FAA, but if the FAA withdraws these letters, we care about affordable housing and we support this so long as the FAA withdraws this. It's a three-sentence declaration. Actions speak louder than words, and the actions are they approved until they did it. And one other thing, your honor, it's in the record. The relatively new airport director, Levi Brown, who was very much part of the pilots coalition that wanted the airport to be used for that and not have the development, now he decided he needed to go to the FAA in June of 2023 in Denver and ask them to write that first poison pill letter. If he thought that the city was on the fence or was not going to go ahead and approve this, he wouldn't have needed to do that, Hail Mary, but he did because he knew what the facts all show here, which is this thing was getting ready to be approved until something happened. And what happened were these letters, these letters that completely ignored what the FAA side of that non-hazard side of the building had done. And more importantly, we asked John Bauer, please explain why this is incompatible. You know, maybe we can learn from that how to make it compatible, but he refused. So here's just, I know they haven't been as specific as you'd like, but the FAA has now said in various ways, the concern here is even though you're not obstructing flight paths, if an error, you know, an accident happens, having an apartment building near the runway increases the consequences and there might be noise litigation. And is there any evidence that the city thought about those concerns and had concluded, we're not worried about that? In other words, one read of this record that would be unfavorable to you is just, it had not occurred to the city that in the event of an aircraft accident, you don't want a high density apartment building there. And so now they are, you know, in a prior position on that to return to. Now we really are getting into the speculation that the government accuses us of. I mean, this was going along, it was fine. We have in the record, so it wasn't like we're just saying it, we have the capital engineering report that refers to, I don't know, is it 20 other airports with similar situations that have been allowed? And that's why FAA has dug a hole they can't get out of. They can't go back on remand or otherwise and say, well, this is incompatible. Because if they do that, then they will be admitting all these other airports are incompatible. So they tried to do a very narrow thing, which is to stop this in its tracks, but not tell us why, refuse to tell us why. And it's just kind of the arrogance of power. Like we're the FAA, we control the strings of money here, and we can tell these people not to do it, and they won't do it. We just think it's very arbitrary. This is all very helpful. I just have one last question, which is, be helpful to hear you respond to the following, which is, speaking of limited authority, we have order, I think the best you can hope for from us is an order that FAA withdraw its letters. We can't order them to say there is no incompatibility. We can't even order them to reissue letters. So in one view, the best you can hope for is the FAA is, these letters are withdrawn, but everyone's still left in the dark about what the FAA thinks. And how do you? No, that helps. That helps a lot because right now, if you're the government official in Longmont, all you've got is the FAA saying, you allow this, your funding is going to be taken away, or there's a significant chance it's going to be taken away. And you can't allow that as the local person. And I get that. Once those letters are taken away, then that means that the Longmont people no longer have an empty chair to blame. They can no longer say our hands are tied. At that point, they're subject to whatever due process requires for a property owner. And that's fine. We just want to take out this false elephant in the room, which is the FAA letters. It's not fair what they've done. The FAA letters should be removed. At this point, it's in the record that at least it's strongly suggested that FAA told Denver to stop issuing those letters and they stopped. The one thing we're trying to seek from this court, Your Honor, is to ask the FAA to withdraw letters that are arbitrary and capricious and never have been issued. Judge Garcia asked you about noise and about the residential density. I thought there was an assurance that there would be no, basically that whoever's going to be using this building has agreed they're going to put up with the noise. Absolutely. Very strong navigation easements. Nobody can go into that building without agreeing. We're coming to an airport. We understand an airport's there. We're not going to wake up tomorrow and say, oh my gosh, there's noise, there's gambling going on. We're shocked. That is covered. No question. I took the concern to be really about the residential density. You opened by talking about how these had already been approved as safe, the Part 77 no hazard determinations. I understood there to be two different kinds of inquiries. One is the FAA doing the no hazard determination, which is basically saying where our planes need to go, can we clear whatever's in the way? They found that they could. But then there's a separate inquiry, which has to do with the locality and looking at its interest, its people, which interacts with the FAA's expertise, but it's ultimately this local zoning question and that that had not the question whether they had considered the residential density was less clear than the noise question. Well, you know, we did it's a JA84. There's a letter from our client on July 16, 2024 to Mr. Bauer that says, okay, we understand you're claiming safety, but we asked therefore, what is the standard for compatibility that is being violated? In the absence of an FAA standard, compatibility could arbitrarily be determined. It could differ from project to project and airport to airport based on the subjective judgment of the FAA official who happened to be involved. That's our case. This is subjective. They say, well, there's this advisory circular and talks about density, local regulation of concentrations, people. What is arbitrary about the city saying, you know, we hadn't really thought about that. In fact, it's almost as if the city's making the same conflation that you were. Well, FAA in the part 77 no hazard determination has told us this is all safe, but without focusing on their responsibility, not for the planes and the people on the planes, but for the people on the ground and the residents. There's no evidence that the city came to that or said, oh my gosh, we didn't know about that. Quite the contrary, your honor. In JA335 to 341, this is what I was talking about before. Judge Garcia mentioned this is from the May 7, 2024 meeting of the planning board there where, you know, you can see the officials, including Ms. the planner, basically saying we've never seen the FAA do this before. We've never in our lives been threatened with these letters. It's our airport. We're usually able to do what we want. So this was all very new to the city, but certainly in the time frame before the Bauer letters, they knew what the city was claiming. There just was nothing substantive put behind it. And again, when you refer to advisory circulars or whatever that aren't even part of our record, I mean, that's just appellate counsel saying, you know, theoretically, maybe if I had been at the FAA, I could have worked with these documents. We could have done it that way. But that's not what they did. They were coy. They didn't want to give us the reasons. They didn't want to give us a final order, Judge Edwards, you know, but sometimes you have to say we need a final order because we're not going to just keep and the final thing, your honor, I'm well over my time is it's not like we were in a position to do a part 16 of those many years in my mind. Sure. What you're saying with respect to one precise matter. Withdrawal of letters. Huh? Withdrawal of arbitration. What precise substantive issue is it that you think the FAA has a judge in a way that's adverse to your interest that you want removed? In other words, a normal agency case, the issue is X, the parties fight over it, the agency says X plus one is the answer and that's what comes to us. Were they right in X plus one or not? You're fussing about the exchange of emails. And one of the problems for me as a judge is trying to figure out, well, wait, who's challenging what? What's on the table? And what is it that you think is offending here? Yeah, I think I can to be clear are the Bauer letters, the incompatibility letters. We asked they be withdrawn. The FAA refused. That's the final order. But to your point, Judge Edwards, I did cite a case that was my case. We had Judge Williams. I don't think anybody else from this panel back in 2014 called security point media versus TSA and counsel for the FAA tried to say that was an opposite for some reasons. But the reason why it was very similar and I remembered it is because Francine Kerner at the TSA was angry that my clients had brought a patent infringement case against the government. So she basically took indirect orders that required airports to sign new license agreements for my client's patent. And once again, she refused to do a final order. Finally, we sent a letter to her and said, you know, Chief Counsel Kerner, justice delayed is justice denied. We would like you to tell us you're not going to do anything about how you're missing up frankly with our contracts at these airports. She finally did send a letter that said I'm not changing my position. That's my position. And Judge Williams did find that was a final order because basically a business had come to the court and said an agency, it was TSA here, it's FAA, is interfering with our business. They're overstepping. They're basically unhappy about something. So they're taking a shortcut to hurt us. And Judge Williams found that was the case there. I mean, if you see the opinion, it's in our papers, security point and that's what's happening here. John Bauer just decided to take a shortcut. He was tired of all the noise litigation. He was tired of various things that are happening in Colorado. And he realized that he could send some strong letters and he could accomplish what really should have been accomplished through an arbitrary and capricious type of, you know, something where we can present evidence and the FAA would actually have to come out and say, here is why it's incompatible. Not, oh, well, it's one thing to say, well, you've got some multi-use development near an airport. In theory, okay, we understand that. But in specifics, what does that mean to a developer who is trying to build something? One way that security point seems a little bit more straightforward is that the TSA actually did change the contract template, the memorandum of understanding. Whereas in this case, they're purporting to be applying the prior standards, the agency, the advisory circular and just say, look, you know, this is a separate thing from the part 77, no hazard determination. And so, rather than seeming like a new restriction, it's bringing to maybe sort of bringing to bear a preexisting restriction. So, I'm interested in your reaction to that. And just generally, what is the precise legal consequence, the second part of the finality inquiry that we should identify from the April 30th email? Sure. Well, thank you very much. On the second point, we've had the property since 2017 or before, started the process. As of today, nothing's been built. That is harm, that is injury. It's not recoverable. I'm talking about legal consequences that flow. We can't build. From the letter. We can't build because the letters are a poison pill that any sane person in Longmont would not allow this to go. But what is the legal consequence and what's the case that is closest in terms of, I mean, there's a practical consequence for sure. But, you know, we have a lot of finality cases that deal with this question about whether rights or duties have been affected or legal consequences flow. And I'm just the most precise you can be on what the legal consequences are. And security point, while you're answering, security point essentially is announcing a new policy, which was the challenge in that case. That's what I'm trying to figure out. This is not a security point case. Well, I think that Judge Pillar, the one thing I'd say is the arguments you were making about this compatibility issue, those are all post-hoc. We never got a letter from the FAA that said, go look at this advisory circular, or here's how we apply it. This is something the council has pulled out. Not to us, they didn't. But you're claiming, I mean, you're the third party. That's where it's sort of difficult. Like what if there were contemporaneous back and forth between the city and FAA on this question? Is that a generic problem or not? If at the time they were making the decision, these were the concerns that were being raised. It's very clear in the record, as I mentioned, and I quoted during oral argument, Your Honor, that the city in September said, we're pulling the plug because of these letters. I mean, that is very clear. They got the letters from John Bauer and they stopped the process. That is what's in the evidence. So it's contemporaneous. And if the reason for doing that is looking back at the advisory circular and thinking about the safety to the Toms people, it's distinct from, or the city folks, it's distinct from the safety of aviation as such, that's neither post-hoc nor arbitrary. Maybe if the Bauer letters had done that, Your Honor, and we would have something to aim for and understand, but the Bauer letters say nothing of that effect. They just say what you're doing. There's a letter, September 17th, that violates grant assurance. And then they pull it back and say, actually, we misspoke. It's our view that it violates the grant assurance. Like that makes a difference. In the real world, it does not. And so, but I do think this... And where do you take from that, the shift from that's trying to be... It doesn't mean anything. Not interfering, but you sort of chuckled because you... Well, because they thought it made a difference. Shady about that. Not shady, a little too cute, a little too coy. The bottom line is when you are a sponsor of a federal airport, especially one like Longmont, that really needs Fanspran, the money, and the FAA says, you're going to do this and we're going to take the money away. There's no discretion. It's coercive, it's determinative, and there's no real argument otherwise. Do you think there's a ruling from the FAA that says, if you do this, we will take the money away? That's what those letters say, yes. That's your surmise, or do they say that? They say that you'll violate Grant Assurance 21. And everybody knows the only thing that happens if you violate Grant Assurance 21 is ultimately all your money, both what you received before and going forward can be taken away. That's the one thing that the government has. And they know that, and the city of Longmont knew that. And again, if you look back on the 2024, this again is JA 335 to 341, the transcript of the Longmont City Council study session, you can see their shock, really, at these FAA letters, which is a new thing. I'm sorry, what pages did you just say? Sure, Your Honor. It's JA 335 to JA 341. Actually, 41 is the one where the Hildago said, I don't know, it seems like coercion, talking about the FAA letters. But Jennifer Hewitt-Apperson is the principal planner there. And she talks about here how, you know, this is all new from the FAA. They're not used to this type of pressure for them telling them how to run their airport. So it's not like it's some standard that's been out there. And it's just business as usual. I mean, this was a shift. And it's really is what the FAA was doing. And we tried to find out what it is that made this incompatible in the view of the FAA official. And he refused to tell us, which is arbitrary and capricious. And, you know, I think that this is not like we just came out of the woodwork. We want to be at the airport. This was in the works for a long time. It was happening. The airport director did a Hail Mary by going to the FAA because he knew it was going to happen otherwise if he didn't. And the thing that is similar to Security Point Media is the fact that what Francine Kerner and the TSA were doing there was having an impact. And it was causing Security Point Media to have problems getting their carts and trays method into airports. So, yes, it was a change because they weren't happy that we had sued the TSA. But ultimately, it was kind of an end run, kind of a pressure campaign that the TSA was doing with airports. It was inappropriate. And, again, thank you for your time. I'm well over my time, but it's inappropriate with these letters. I think all you should read, I'm looking at them, read in those emails the FAA is suggesting, take the worst of it, that if this proceeds, we can act against you. Merely sending an email is not a final disposition of what they could or procedures to put that Assurance 21 in play. You can't have someone in Washington just sending an email saying we've revoked it. That's not the way it works. No, they would have to file which they can. So, there's nothing like that on the books. So, you have someone in Washington sending something saying, well, if you do that, we'll what? You can't find the person who was writing you didn't have the authority to make the final disposition that the FAA might have been able to So, that's one of the things that's bothered me all along. You don't have a final disposition from the FAA. I think it's an obnoxious exchange that's going on. It makes no sense. We shouldn't be doing business that way, but you don't have a final disposition. It's final. We asked for the letters to be withdrawn and they said no. They can't make it final that way. So, even if someone says we might act against you, that's not a disposition of the issue because we might act you merely contemplate the possibility you could win or lose if they do act against you. No, I totally respect what you're saying, your honor, but in the part sixteen world, these cases take four years or so and no responsible airport official is going to say we'll roll the dice. Once they were told this is going to violate Grant Assurance 21, their hands were tied. The only relief we can get here and it's not fair to say that there's nothing we can do because there's a part sixteen and it doesn't apply to you. These letters were out of line. They were arbitrary and capricious. They can easily be withdrawn. They should have been withdrawn and we asked the court to wait. Isn't what you're saying is it's not the action, the underlying threatened action on the grants that you're challenging? What you're challenging is the sending of letters saying this appears to violate your grant assurances and the finality is that they're not willing that the sending of those letters is final as to that opinion. As to what? The finality of the letters are harming us. We went to great efforts. No one up here is naive. We all get that. That's not the point. That's not the way we view finality normally. But we put in the record the capital engineering report. We put in various letters that I sent to the multiple chief counsels. We put in evidence that was never addressed. It wasn't like, I get that, but that's going to arbitrariness. So, but it seems like what you're challenging is not a decision, an actual underlying decision, whether the grant assurances are violated, but rather a decision to take a different action that's having an effect on your client, which is an action expressing an opinion that they might, the grant assurances might be violated. And then the finality of the refusal to retract that opinion. So they're doing something in the world that has an effect on your client. For now, we're going to bracket the question of what the legal consequence is. But it's final in the sense of FAA action opining on something that has huge consequences for your client. So the final action is, or the action you're objecting to is not a determination that the grant assurances have been violated. That's right. An opinion about them. We are challenging. If we issued an order and they withdrew, they said, okay, we withdraw the emails. That is no assurance for your client that they will not act against you as they legitimately can. And if you said, but wait, they withdrew those emails. They would say, well, that's not the process for making the determination. We're now acting against you because we think there's a problem. You've gotten nothing. These are letters. And it's like the SEC going to a company and says, we're not telling you what to do, but if you roll out what you're doing with this public offering, you're going to violate the SEC law. And if it was a total rogue agent at the SEC who had no doing that, and we went to the SEC and say, you're screwing up our deal. Please tell the world that the guy was a rogue agent and you're withdrawing his letters and they refuse to do so. There would be a final order. That's what we have here. And your position is it doesn't have to be guaranteed. It just has to remove an obstacle for your client that is appreciable. And you're willing to be in that world where yes, the city and FAA will continue to discuss this. And potentially, you know, have further interactions with you about it and make an open decision. Right. Because they will make the same decision. But it's your view that that doesn't A, defeat your standing or B, render this non-final. It's a final decision of the FAA. We have standing and we're quite happy to have the relief B, that the letters are withdrawn because we know that there's no other basis for the city to refuse. But as long as they have the chair, they can point to the FAA, our hands are tied. We're just trying to take away that empty chair, which is unfairly prejudiced, prejudicing our client because of a rogue FAA agent who went outside, hollered outside the lines. And there has to be some way to deal with that when it's a real world impact. Now, if we had one, just one way of our, sure. So if we really focus in on finality and what is the legal consequence, in my right, if, if the suggestion is that we might say this is a formal, straight-laced technical matter, there is no legal consequence unless and until FAA actually makes a decision that funding is revoked. And what you would say in response is, we're, there's just no way in the real world we'll ever get to that. That's right. You can't make them start a part 16 and the city in the real world is not going to do another thing with these threats. I could have said that better. That's exactly it. Could not have said it better. And and you, you pointed to the situation in Security Point. Right. Other cases where, I mean, there are a number of cases where legal consequences are hurdles to a business that are raised or removed. What are your, in addition to Security Point, what are your? Yeah. We cited a couple of those in the papers, your honor. I think one had to do with the water issue where they couldn't get, even though it was a third party involved, they couldn't get access to the water because of it. I do think it's a slippery slope and there are certain situations where somebody could say, well, that's speculative. But here we, again, we have a record where it was being approved, where coercion is in the record. And as a practical matter, there's nothing the city's going to do other than just twiddle their thumbs and wait to see what happens in Washington because rogue agent does something that is very threatening. It's not just, you know, opinion, maybe you should look into it. You know, they were very, very, very clear. This violates, this is a, this is not compatible with your airport. And if they had gone on record and say why it wasn't compatible or why one of these ACs applies or doesn't apply, we wouldn't be here today because frankly, we could probably work with that. But the idea they were just going to put their hand up and say, we're not going to allow it and we're not going to tell you why it's arbitrary and capricious as a practical matter. We did everything we could. We didn't jump when the letters were issued. We didn't come right to court. We tried to give the FAA every opportunity to fix this. And that's what we're asking the court to help. Thank you. Morning, Ms. Lopez. Morning. Sorry, it always takes me a second to get it to my height. Take your time. You can proceed whenever you're ready. May it please the court, Carolyn Lopez on behalf of the FAA. I want to start off where the court did in the colloquy opposing counsel withstanding. I think, you know, as per the discussion, National Wrestling and DNF Alfonso are really the relevant cases. And I did just want to highlight one other piece of the record to talk about how strong the evidence, countervailing evidence here is that the city actually acted on multiple independent reasons. We don't actually have to speculate about what the city's reasons are. The city fooled us. This is at JA 197 to 198, particularly JA 198. And there the city laid out all the rationales for not approving Modern West. That included the city's own finding under its own municipal code that the project failed to mitigate adverse consequences to surrounding properties. Yes, it did mention the FAA, but it also mentioned Colorado. So it's just speculation from the other side that Colorado wasn't important to the city. The city said Colorado was important to it. And the city also incorporated all the rationales at the August 2024 public hearing. And I think they would say all of these, there are a lot of different words here, but they're all just channeling this idea that the FAA has said there's a safety concern in the event of an accident. No one had thought of that until the FAA sent a letter. And so if we vacate those letters, there's no reason to think they're going to stick with these conscripts. No, Your Honor, because as per the, for a couple of reasons, one, so one is sort of the legal framework that we've been discussing this morning. And one is the record before us. So the legal framework is when we're talking about these decisions made by the third party, that it's a third party that's actually causing the injury, not directly the federal government. And the record suggests that there are multiple reasons. It's actually not the government's burden to show that there's no way that it's, you know, that it's the FAA influencing and it's petitioner's burden to show that in fact, this was caused by this cause and not that cause. And we know that, for example, in DNF Alfonso, which we talked about in our response brief into which they've, you know, offered no rebuttal in their reply or really today, the best they have as one city council member expressed earlier in his proceedings before that resolution was issued that, you know, she wasn't happy with FAA's letters. And that's simply not enough to carry their burden. And they certainly could have gone to the state to ask for clarification. And in fact, the record evidence that we have again at JA198 suggests that there are these multiple independent reasons and under national wrestling and DNF Alfonso, that's just not enough for them to carry their burden. Do they have a right to get a response from the FAA? We, I mean, so we, these letters are between the city and the FAA because they have to. They have a right to get a response from the FAA as a developer in an area affected by some regulations that cover this. And they're good citizens out there, business people, and they know the FAA has a role to play. And so responsibly, they interact with the FAA. We want a response. Is there any issue here? To the degree that they, so we, again, these are informal advisory letters between FAA and the regulators. I'm just asking, do they have a right to get as citizens participating in this society, doing business, trying to follow the rules, do they have a right to go to the FAA and say, you apparently have a role in these things. We'd like an answer from you as to whether there's any problem. They have a right to do that? Judge Edwards, what I can tell you today is that to the degree that there is any such right, they did receive responses. And if I might just go to the record to sort of walk through how those responses happened, you know, so standing at the podium. No, I'm not getting an answer to my question. You conceding they have a right to go to the government agency and to get an answer as a legitimately interested party to get an answer on a question that could be involved in this? No, Your Honor, I am not conceding that they have some sort of formal right to a particular type of response. I didn't say that. Do they have a right to seek? You're characterizing. I'm limiting it. Do they have a right to seek a response from the agency that is in play here? One of the agencies that's in play, city council certainly is, the FAA certainly is. Do they have a right to say, and they got to have all these things, they have a right to say, well, we want to go to the FAA and make sure there's no issue here. We don't think there is. They have a right to do that? They don't have the right to ask FAA to specifically approve or disapprove of particular development plans. But here, I do just, I mean, they asked the FAA questions. You don't want to answer my question. No, I'm serious because this is a silly case in a lot of respects, respectfully. And things went on. I'm speaking as an observer watching this. You say, how in the devil does stuff like this go on? Why couldn't we just have answers given legitimately as opposed to the government official having a role to play saying, we're not going to tell you anything, but if we have anything to say, it's bad, and we know that's going to hurt you, but it's too bad. And there's no way they can get redress. So, Your Honor, this is why I wanted to separate out for a moment whether there is a specific right of redress from what actually happened here. So, what actually happened here, and this is evident in the record, is that FAA had multiple meetings with Petitioner, and at those meetings, so Petitioner had noticed both through their specific multiple emails and meetings with the FAA, and by attending those meetings, the public hearings that the city had. If I could just take a step back, and I apologize, it's a bit of a wind-up to walk through the record and all of those things, because I do understand Your Honor's concern. What is a developer supposed to do? And I don't make this as sort of a fringe case in which FAA just never spoke to the developer at all, and so I just don't think the exact parameters of that need to be adjudicated for purposes of this case. So, in terms of we heard opposing counsel say today, listen, if they just told us the advisory circular was the standard, we would have known. Well, we did tell them that the advisory circular was the standard. So, they talk about a letter they sent to FAA at JA84, and the next page in the record is JA85, and that's FAA's response, and FAA says in response that the city, quote, must comply with grant assurances and adhere to FAA advisory circular ACs regarding compatible land use. See, that would be... That's... Right. Oh, yes. We've reviewed the record. There is never a time, is there, when the FAA says... The circular is very vague. It just says what the grant assurance says, residential high-density near airport, bad. They never said, this would be different if it was 500 feet that way, if you restructured the building in this way. It just over and over is a vague reference to a circular that is itself vague and says apartment buildings near the runway are bad, and they're asking, where can we put it? And is there an answer that is instructive in any way on that? Your Honor, you know, respectfully, I disagree about the vagueness here. We're not talking about sort of a fringe case here. There's no question that this, for example, that this is high-density residential. I mean, these are two, 300-unit apartment buildings, and I think one of the pages that's the most specific, this is addendum eight. This is the same advisory circular that FAA pointed them to. This is paragraph 2.3.1.3, and so they talk about ways to... This circular talks about ways to mitigate the hazards created by residential living, and it says drug techniques... Addendum to the red brief? Addendum to the red brief. It's addendum eight, and again, I just want to highlight that this, we included it in the addendum for the court's convenience for precisely these sorts of colloquies, but this is the same advisory circular that FAA pointed both petitioner and the city to. So this is at addendum eight. It's paragraph 2.3.1.3, and it says techniques that can be used to minimize or mitigate the effects of such incompatible development include placement of residential structures on the outer edge of a parcel rather than directly underneath a runway's approach or departure pathway outside of RPCs, RPCs being runway protection zones. And so if I might just take a step back to sort of describe what that means in technical terms, and of course, the developer was represented by very able counsel in these conversations with FAA, so these are not new folks to these questions. Basically, when you think about approach and departure pathways from the airport, I'm oversimplifying this a little bit, but it's basically a triangle, and the runway protection zone is the part of the triangle that is the closest to the airport, and there you're not supposed to build anything. But the rest of the triangle a little bit farther out, which is where modern west one and modern west two are located, you're not supposed to build high-density residential, and we know that that's all in the advisory circular. And then just in terms of additional communications that got more specific between FAA and petitioner, so for example, at JA-60, FAA said given its location, high-density residential, so saying it's the location that's a problem, high-density residential will still be viewed as incompatible even though it's only a portion of the development at JA-47 through 49. This is sort of repeated a couple of different places, but this is one location. FAA discussed flight data, and recall that when looking at these images, this is just flight data from three days. It's not even a week or a month, and there are multiple flights that are flying directly over modern west two, and so they really did give petitioner, you know, everything that they needed to know why FAA had concerns. Can I shift gears to, so on finality, what could they do? If we issue an order saying you can't review this because there's not yet a concrete legal consequence in the sense of actually denying funding, how can they get to a reviewable order? What should happen? And this sort of segues a little bit. This is where sort of, I think, standing and finality sort of merge a little bit here, which is that when we're talking about this field of where the injury occurs, not directly from the federal agency, but through some third-party actor, where the third-party actor has sort of multiple reasons why it says, and, you know, even if it had just said, FAA raised this safety concern, said nothing about, you know, it does say things about Colorado, it does say things about the public, but even if it just said, hey, we didn't realize that this was a problem, we've taken another look at it, it is a problem. We personally think that there's a safety issue. To the extent that they have any remedy, it's litigation against the city for, you know, whatever loss of value to the land. Now, of course, if the city goes forward, then, you know, as this court recognized in Southwest Airlines, it's not sort of these initial, you know, I wouldn't even call them pre-enforcement letters, just sort of flagging an issue and saying we may take enforcement action. It's what happens at the end. So either they convince the city that they're right and the city should go forward, and then there will be a because of senior jurisprudence, you know, their argument is litigation against the city and not litigation against the FAA. And the part 16 is entirely, you know, discretionary on the FAA when and whether to initiate, right? So that's right. If the city was really committed to this, do you think they would go ahead and approve and start building and just wait for the FAA to weigh in? I think, you know, one option would be the city could say we are finally approving this building. We, you know, we don't care what you said. We disagree that this is an incompatible land use. And then FAA would have the option of taking enforcement action on that one. Has any have, I think this actually is in the record, but are there other, any airport that has ever done that? So you have threatened to withdraw all our federal funding, but we're going to press ahead anyway and go through the litigation expense. So, for example, Southwest Airlines is that case, right? It's not a land use compatibility case, but it's a grant assurance violation. And FAA says we think you should stop doing it this way. And the airport sponsor says, no, we'd like to keep doing it this way. And then FAA takes part 16 action. Against Southwest Airlines? Against the airport sponsor. That case was brought by Southwest Airlines saying, you know, we have to be able to challenge the letters that were the advisory letters that were sent to the city or sent to the airport sponsor. I'm just puzzled by, I thought that the record showed, and I'm just looking for it and not finding it. I thought the record showed clearly that the city had zoned this parcel for multiple uses, including high density residential. And just, I mean, I'm just trying to figure out why Modern West was allowed to proceed as far as it was and given so many concrete assurances that it had cleared really significant regulatory hurdles, both with FAA and with the city, that this could kick up as late as it did. So, I can't speak to what was happening between the city and Modern West before FAA learned of this. FAA, as we discussed in our brief, first learned that not just there might be some, you know, it was going to be mixed use. There might be some residential, which might mean, you know, one house, but that actually this was going to be, you know, 300 unit apartment buildings when the city, so just to be clear, the airport manager is actually the city's own employee. And this happens sometimes with government, different government actors have different ideas about whether something is a good idea or a bad idea. There's nothing pernicious about the airport sponsor, you know, the airport sponsor's employee saying, hey, this huge building might go up with lots of folks in it. FAA, do you have any concerns? So, that's at JA41. And at that point, FAA takes a look and tells the city, hey, we think there might be a problem here. And at JA43 through 45, this is emails between FAA and the city. I apologize if I'm, I know I'm repeating things that your honors have already read, but FAA says, you know, we are, this isn't, these aren't just letters going to this airport sponsor. It's not, you know, some rogue letter just to you. We've sent similar letters to four other airports. And one reason we're really concerned is because at those four other airports, there were plane crashes in the zone of where, you know, Modern West 2 is being proposed to be built. That's a perfectly rational conversation to have between FAA and the city. And, you know, I sure hope that my city, upon, you know, getting notice of those types of dangers, would take a second look at things. And at that point, the city has multiple additional public hearings at which, which Modern West was fully aware of those hearings. They attend those hearings, they attach those hearings to letters at the FAA. So this is, you know, for example, the May 2024, or it might have been 2023 public hearing that opposing council was referencing. I apologize, my JA sites are slightly different pages. But at those JA sites, it's the same hearing, JA 460, the city again notes, yes, this is new to us, but lots of other entities are getting these same types of letters, we're not being singled out. And I will just say, it's not that surprising that this is the first time that the city received something like that, because the land in question, if you look it's empty. So it's not like there was previously a proposal to build. See, the problem is the FAA, you disclaim, but the FAA wants to have it both ways. They don't want to be engaged, which these emails over the top and saying this isn't final, we're being very self-righteous. On the other hand, they made it very clear, this could create an unsafe and incompatible land, they're litigating the issue. The problem for the other side is, even though you're claiming we're not really weighing in here, the agency has weighed in. And it is suggested, here's what our determination would be. And in the last email, it says we're not backing down from our position. Well, if you're on the other side, that's a disposition and the unfairness of it under agency law is, we don't know if there's substantial evidence to justify the FAA's alleged concerns. There isn't, there is a behind the scenes connection from an individual who has a gripe in the local area, gets in touch with someone from the FAA, and then bad things start happening. That's not the way you litigate an issue before an agency. So this person has some gripe, goes to the FAA, FAA starts buying in, and they essentially are rendering dispositions on the merits and simultaneously disclaiming any. This is not final. We don't really have anything to say incidentally, but we think what you're proposing violates all our laws. We will come after you. I don't know how you'll leave something in that situation. Where are they supposed to get redressed? Where are they supposed to get? They're supposed to get redressed by lobbying the city and saying, we think you should make it different. The FAA is a player. They assumed they were a player. They responded as if they were a player in pretty loud terms. I think a couple of times they sent emails without something preceding it to weigh in. They had been pumped up by someone in the local area. It's a very unfair process. They had gotten aroused and they weighed in, and they weighed in a way that was totally negative to the other side. The other side may deserve to lose. They may not. My concern is, did they get anything resembling process that we think is acceptable? Your Honor, again, just to put a pin in the two thresholds grounds, I think this petition should be dismissed. I just do want to be clear that I think the record does not reflect that set of circumstances. Again, one FAA receives a letter from the airport manager. That's the person who is in charge of making sure the airport is maintained safely. And so we have a lot of based speculation from the other side that it's somehow improper for the airport sponsor to do that. But from FAA's perspective, that's actually exactly what's supposed to happen. A responsible airport manager, if they find out that there is going to be construction, that might be a danger to folks on the ground because of airport operations, is supposed to tell the FAA. The other folks that FAA gets letters from are a pilot's association. So it's the pilot's association. This is at JA88. The pilot's association- My question, I understand that can happen. What I'm asking is, you're adjudicating, my surmise from this record is, you're adjudicating the rights of a party that has the right to be heard by a federal agency. You're effectively adjudicating their rights and then saying, go away. This is not final. Yes, we've damned you and we know it. And we're not back, the telling thing in that email, we're not backing down from our position. That's a negative position. You say that in the email. We are not backing down. That clearly, an agency has to know that has consequences. They issue that and simultaneously say, but we're not really doing anything. Sure you are. Just to be clear, your honor, at the point that that email happens, the city has already, at JA198, many months before, rejected the zoning approval. And so just sort of ask FAA to withdraw non-final agency action after the city has already made a decision. It's not surprising that FAA said, no, we're not going to do that. And then just, I understand, or I think I understand your honor's concern about sort of what is a developer supposed to do. And I think there are a couple of ways to think about that. Well, and this is sort of always the tricky part where we're talking about the agency action is to a directly regulated entity. That's the letters between FAA and the city. And somebody else who is not a directly regulated entity gets upset about what happens because of the agency's communications with the regulated entity. And this court, for example, on independent equipment says, if these types of agency actions, these letters back and forth to regulated entities are automatically final agency action, that is going to muzzle much needed, you know, work a day communication between agencies tasked with safety missions and their regulated entities. This worked precisely the way it's supposed to. It raised to the city, which may have been under the misimpression that there were no safety concerns, that there could be safety concerns. If the city had gone ahead, then FAA would have had the, you know, option of taking enforcement action proceedings. And that's just the way this particular regulatory scheme is set up and consistent with this court's precedence in both the standing arena and the requirement that their final agency action petitioner just hasn't met their burden to show either of those things. And for the reasons that we lay out in the brief, we also think that there was more than sufficient agency explanation, particularly under this court's precedence under DeForest, where one looks not just at the face of the letters themselves, but the entire explanation. And indeed, the city in one of its city hearings makes this point. The city attorney says this is at JA 119 through 120. The city attorney says, you know, this isn't just from the letters themselves. This is also, they say that FAA's concerns were triggered because, quote, its guidance document talks about density of residential development around an airport. And this development has been described as high-density residential. And it is fairly concentrated and goes on to say that the issue is that it poses a safety risk in the event of a crash, both obviously to the pilot and crew, but also to the people in the building. And so this really is a dialogue back and forth between an agency and a city. And then as we know from JA 198, the city makes its own decision. Can I ask, is there any good reason that letters like this don't include much more tentative language? This does not read, the first draft says this is in violation. You switch it to the FAA views. I'm actually not sure there's any difference between those, but it does not say at this preliminary juncture, based on our tentative review of the facts, we believe you may be in violation. And that would play very differently than this. Taking a look back, you know, of course, these are, you know, technical folks. Could it have been worded differently? And would that have made my time at the podium a little shorter? Maybe. But what they did here is enough. So just to be clear. Okay. I mean, there's actually a related question of why you didn't just withdraw the letters. If they have no legal consequence, and you're going through all this problem, and you're coming here and you believe that the city has now just independently agrees with you and the state independently agrees with you, it might have been a reasonable thing to do to withdraw the letters. And in doing so, say, just so you know, like, you are objecting to us expressing our view. We're going to not express our view. That obviously doesn't foreclose us from coming in later. That's certainly an option that FAA has. It's a weird thing to do to try and defend them and say there's no legal consequence. It's not odd in that the principle that is being, is at issue here is FAA's ability to, rather than undergoing enforcement action when it may be too late, is to send advisory letters that say, we think there might be a problem. Can you take another look? That is a very reasonable answer. They should definitely sound advisory and not like this. So I do, you know, I agree that there are other ways that the letter could have been but I do want to highlight as well that the letters themselves specifically say that if you have any questions or concerns, please contact FAA. And so there's enough on the face of the letters to indicate that it's an ongoing dialogue. And the reason that we know it's an ongoing dialogue is because what FAA does is continue to have dialogue with the city in multiple conversations. And the city talks about that and it's over several years. If there are no further questions, I would ask the court to dismiss the petition. Thank you, your honors. I'll see you very quick. Two minutes. The Southwest case was my case. Very different case. I think it's just important to put on the record. That was a situation in Dallas Love Field where Southwest had 18 gates, Delta wanted two of the gates. It's a big fight about it. The city filed their own lawsuit, washed their hands. And at some point, Southwest had to deal with some letters from the DOT that were problem letters. The difference is that by the time we filed that case, the DOT had convinced the FAA to file a part 16. And sure enough, there was a part 16. And there was also federal district court litigation in that case. So there were ways for the parties to deal with whether or not Southwest needed to accommodate Delta's gate accommodation request. But here, we do not have an angle. And I think that's been very clear. I think when you're relying as defense counsel on the addendum, I think that says a lot. It would have been nice to have decisions that would have taken what was in the addendum, the advisory circulator, and put it in the facts of our case. But they didn't do that. As late as February 3, 2025, Modern West, this is JA575, writes a letter to Jesse Lyman. That's a new name. And he says, basically, we understand that, you know, John Bauer, who wrote those two letters from 2024, has gone to another position. And you're taking his position, and that's fine. And we ask again, the letters do not state that the project is incompatible based on safety, noise, height, density, color, or any other factor. Nor do they state the approval of the project would violate any FAA standard regulation or guideline. You don't cite a single FAA standard as to why this is violated. We would like you to do that so we know what it is we're dealing with here. And like everything else, that was ignored by the FAA. Finally, Your Honor, again, I think actually, I'm not even going to say it. I think what Judge Edwards said at the end kind of stole what I was going to say as to what happened here and how this came about. So we think that this was not the way Washington is supposed to work. We think we had a rogue agent who probably had the best intentions, but he went outside of the process. And therefore, because of that, our client got no process. And we would ask that these letters be withdrawn. And we don't understand, and we agree, why the government that says if they have no legal consequence, why they will not withdraw those letters. Thank you for your time and attention. Thank you. The case is submitted.
judges: Pillard; Garcia; Edwards